

**THE ATTORNEY GENERAL**

**OF TEXAS**

**AUSTIN, TEXAS**

PRICE DANIEL
ATTORNEY GENERAL

November 20, 1948

Hon. S. C. Ratliff　　　　　　Opinion No. V-723
County Attorney
Delta County　　　　　　　　Re: Constitutionality of
Cooper, Texas　　　　　　　　　　S. B. 70 (50th Leg.)
　　　　　　　　　　　　　　　　　　and validity of a pro-
　　　　　　　　　　　　　　　　　　posed County Home Rule
　　　　　　　　　　　　　　　　　　Charter under Article
　　　　　　　　　　　　　　　　　　IX, Section 3, Texas
　　　　　　　　　　　　　　　　　　Constitution.

Dear Sir:

　　　　You request an opinion on the constitutional-
ity of Senate Bill No. 70 of the 50th Legislature and
the form of a proposed County Home Rule Charter for
Delta County.

　　　　Senate Bill No. 70 (passed by a 2/3rd major-
ity of both houses) reads:

　　　　"Sec. 1. The people of Delta County,
　　Texas, are hereby authorized to proceed un-
　　der the authority of Article IX, Section 3,
　　of the Constitution of the State of Texas,
　　for the adoption of a County Home Rule Char-
　　ter.

　　　　"Sec. 2. Such a County Home Rule Char-
　　ter shall be adopted by a majority vote of
　　the qualified electors residing in Delta
　　County, Texas."

　　　　The pertinent part of Section 3 of Article
IX of the Constitution reads:

　　　　"A county having a population of sixty-
　　two thousand (62,000) or more according to
　　the then last Federal Census may adopt a
　　County Home Rule Charter, to embrace those
　　powers appropriate hereto, within the specif-
　　ic limitations hereinafter provided. It is
　　further provided that the Legislature, by a
　　favoring vote of two-thirds of the total

> membership of both the Senate and the House
> of Representatives, may authorize any county,
> having a population less than that above
> specified, to proceed hereunder for the adop-
> tion of a Charter; however, as a condition for
> such authorization, it is required that no-
> tice of the intent to seek Legislative auth-
> ority hereunder must be published in one or
> more newspapers, to give general circulation
> in the county affected, not less than once
> per week for four consecutive weeks. . . No
> County Home Rule Charter may be adopted by
> any county save upon a favoring vote of the
> resident qualified electors of the affected
> County."

You advise that the notice of intention to ask the Legislature to pass such law was duly published in accordance with the above quoted part of Section 3 of Article IX. We are of the opinion that said Act is valid and that it authorizes Delta County to proceed to adopt a County Home Rule Charter under the provisions of the Constitution.

Senate Bill No. 70 does not provide for any procedure for the preparation or adoption of a County Home Rule Charter. The only authority in that regard is contained in Acts 1933, 43rd Legislature, 1st Called Session, p. 249, ch. 91. (Article 1606a, V. C. S.) Section 1 and the pertinent part of Section 2 of said Article reads:

> "The purpose of this Act is to provide
> an enabling Act under the recent Constitu-
> tional Amendment adopted and known as Section
> 3 of Article 9 of the Constitution of the
> State of Texas, hereinafter sometimes referred
> to as 'the amendment,' in order that the coun-
> ties coming within the provision of such arti-
> cle may adopt, upon a vote of the qualified
> resident electors of such counties, a Home
> Rule Charter in accordance with the terms and
> provisions of such portion of the Constitution."
> (Emphasis added throughout this opinion)

> "This Act shall apply to any qualified
> county of Texas, desiring to adopt a Home Rule

Charter under the powers, and within the limitations, expressed by Section 3 of Article IX of the Constitution of Texas. . . ."

Failure of said Senate Bill No. 70 to provide any procedure or adopt the procedure under the enabling act for preparation or adoption of a County Home Rule Charter presents the further question: Does the language "counties coming within the provisions" and "This Act shall apply to any qualified county" in the enabling act include counties which came within the provisions of the law or to any county which may become qualified to adopt a Home Rule Charter after the law was passed?

Morgan v. Potter, (Wis. Sup.) 298 N. w. 763, involved the construction of a statute which reads:

"Any teacher coming under the provisions of this section (42.55) who has attained or shall attain the age of 70 years shall be retired by the managing body of the schools at the end of the school year in which said teacher has reached the age of seventy."

Construing that statute, the Court said:

"We consider that in its opening phrase, 'any teacher coming' under this section (42.55), the word 'coming' means 'who is', whether the teacher was under Sec. 42.55 when Ch. 160 was enacted, or came under the section thereafter. The word 'coming' by implication covers those teachers who had come under Sec. 42.55 before par. (k) was enacted, and those who should come under the section thereafter."

We are of the opinion that the language: "in order that counties coming within the provisions of such article, may adopt, etc." in Section 1, and the language: "This Act shall apply to any qualified county of Texas, desiring to adopt a Home Rule Charter under the powers, and within the limitations expressed by Section 3 of Article IX of the Constitution of Texas; and the people of any qualified county who may desire to move for the adoption of a county charter, under such Constitutional provisions, shall proceed, etc.," (in Article 1606a, V.C.S.) is sufficient to bring Delta County within the provisions of that article, so that it may proceed to adopt a County Home Rule Charter under the procedure therein provided,

under the authority given in Senate Bill No. 70.

The validity of a County Home Rule Charter is controlled by numerous restrictions including those contained in Section 3 of Article IX of the Constitution, a pertinent part of which is:

> "(2) . . . . It is expressly forbidden that any such charter may inconsonantly affect the operation of the General Laws of the State relating to the judicial, tax, fiscal, educational, police, highway and health systems, or any other department of the State's superior government. Nothing herein contained shall be deemed to authorize the adoption of a Charter provision inimical to or inconsistent with the sovereignty and established public policies of this State, and no provision having such vice shall have validity as against the State. No Charter provision may operate to impair the exemption of homesteads as established by this Constitution and the Statutes relating thereto."

The amendment is a most unusual one, involving, as it does, a potential change in every county of the State in respect to its governmental affairs. It is unusual in length and scope. Its phrasing and meticulous limitations are extraordinary, and furthermore it contains some apparently conflicting provisions. Because of its length it will not be here quoted, but specific portions thereof will be set out along with the discussion.

Perhaps the most elementary and important rule of construction of written instruments--whether constitution, statute or contract whatsoever--is that the intention of the maker of the instrument is the real meaning thereof. All other rules are subordinate to this and are merely so many aids to the inquirer in his quest for the intention of the maker.

We shall first give consideration to the overall, primary purpose of the amendment, to discover the

evil sought to be corrected and the means adopted for accomplishing it.

Subsection (1) yields the key to the inquiry, that is, to afford to the county the "highest degree of local self-government which is consistent with the efficient conduct of those affairs by necessity lodged in the nation and the state."

The instrument should be construed as a whole, including the respective parts, separately and collectively, each in the light of the other, and likewise any or all of them in the light of other constitutional provisions having any bearing upon the subject. Where there are two constructions possible, one of which would make invalid or meaningless the amendment, or lead to an absurd result, and another which would give life and meaning to the amendment and attribute to each part a meaning consistent with the other parts so that all may stand, the first construction will be abandoned as inadmissible and the second one adopted as the proper one to indicate the indispensable essential of intention. Pierson v. State, 177 S. W. (2d) 075; State v. Gillette's Est., 10 S. W. (2d) 984; Koy v. Schneider, 221 S. W. 880; Ex Parte Anderson, 81 S. W. 973; Warren v. Shuman, 5 Tex. 442.

Similarly, where a statute or constitution is fairly capable of two constructions, each of which would leave doubt and uncertainty and possible public harm, that construction which would leave the lesser vices and dangers should be adopted as more nearly indicative of the real intention of the framers of the instrument. Thomas v. Creager, 107 S. W. (2d) 705; Orndorff v. State, 108 S. W. (2d) 206.

Another familiar rule of construction is that the affirmative grant of a power carries with it by necessary implication of law the further power to do all things necessary, or reasonably and directly helpful in carrying out the primary purpose. Wilson v. Abilene Independent School District, 190 S. W. (2d) 406.

In this process of construction, literalism will yield to the spirit of a constitution or statute when the latter more accurately shows the real purpose or intention of its makers.

In consonance with these indisputable rules of construction pertinent to the situation, we are of the opinion that the dominant purpose of the amendment was to afford to the counties the <u>greatest latitude of local control of their county affairs, consistent with the superior rights and powers of the State</u>.

If literalism should control our interpretation of the emphatic prohibitions in paragraph (2) of the amendment, above quoted, no Home Rule Amendment could be adopted at all, for the State in its sovereign capacity has always promulgated laws for the control of county affairs throughout the State. Literalism, however, must yield to the purpose of the amendment. Literalism would forbid the adoption of any charter that would abandon the County Commissioners' Court as it now exists and substitute therefor a governing body otherwise constituted. Yet these are the precise things expressly authorized by the amendment. The same comment may be made with respect to the power conferred by paragraph c. of Subdivision (3) authorizing the governing body established by any county to "create, consolidate or abolish any office or department, whether created by other provisions of the Constitution or by statute, define the duties thereof, fix the compensation for the service therein, make the same elective or appointive, and prescribe the time, qualifications and conditions for tenure in any such office."

The true rule deducible, therefore, is that the amendment authorizes any county adopting a Home Rule Charter to "provide for a governing body" other than the Commissioners' Court and incidentally to make all provisions necessary or directly helpful to that major purpose, and the meticulous limitations, qualifications, and exceptions contained in the amendment attest the prohibition to take any step that would affect the State's powers of government other than those expressly or by necessary implication conferred on the county.

Inconsistencies, contradictions, and absurdities are always to be avoided if possible in construction. Holman v. Broadway Improvement Company, 300 S.W. 15; Cramer v. Sheppard, 167 S.W. (2d) 147; Carpenter v. Sheppard, 145 S.W. (2d) 562; San Antonio Etc. Ry. v. State, 95 S.W. (2d) 680; Ex Parte Cooks, 135 S.W. 139.

Applying these rules of construction, we point out some vices in the proposed charter, as follows:

Section 9 contains matter which we think is forbidden by the language of Paragraph (2) of Subdivision 3 of the amendment. We refer to the following portion of Charter Section 9, to-wit:

"The (Manager) may authorize an officer or department head to appoint and remove subordinates under his respective supervision."

It is contrary to the long established policy of this State to permit an officer of the State to delegate his official power to another. No authorities are needed for a proposition so elementary. The last paragraph of Section 9 is also of doubtful validity for the same reason. In other words, the charter makes the Commission a board of officers clothed with constitutional and statutory powers generally to control and manage county affairs, while this portion of Section 9, in some measure at least, would delegate the power vested in the Commission to its appointee, the County Manager.

.Section 13 is invalid wherein it attempts to abolish the office of County Tax Assessor and Collector and to establish in lieu thereof a County Manager as the head of the finance department with the powers of County Tax Assessor and Collector. The office of assessor and collector of taxes is a constitutional one (Sec. 14, Art. VIII) and its functions are not those with respect to county affairs alone, but involve essential State functions as well. Indeed, the sum total of such officer's functions affect the entire financial scheme of government. A county could not abolish the office of Assessor-Collector without serious interference with the superior State governmental policies. The State may not be deprived of its sovereign right to make laws for its own government. The Amendment is to implement county control of county affairs, not to surrender functions and prerogatives to another.

Section 23 is invalid insofar as it attempts to abolish the office of District Clerk for the reasons just given, nor is it within the authority of Section 3, Subdivision (3)c authorizing the consolidation or abolishing of any office or department. The offices and departments there contemplated are those offices and departments hav-

ing to do with county affairs only. This does not include the District Clerk.

Section 26 is invalid. The office of Sheriff is a constitutional office, elective for a definite term of two years. His duties and functions are not wholly with respect to county affairs, so that the public policy of the State with respect to his selection and duties may not be usurped by any individual county.

Section 27, abolishing the offices of Justices of the Peace and Constables, is invalid for reasons already given with respect to other officers, and for the further reason that these officers are concerned very remotely, if at all, with county affairs. They have to do for the most part with state affairs under the police power, which field is one of the principal prerogatives of State sovereignty.

We need not discuss the various sections of the proposed charter, seriatim, but the rules of construction accompanied by the illustrations of vice in those instances pointed out will suffice, we think, as a guide in the preparation of a charter for submission to the people of Delta County.

However, we call your attention to the first paragraph of Section 3 of the proposed charter declaring "except as otherwise provided in this charter, all powers of the county shall be vested in a Commission of five members, elected from the county at large in the manner hereafter provided, who shall serve without compensation. . ."

We entertain grave doubts as to the right of the county to adopt a charter which would vest "all powers of the county" in a commission. The Commissioners' Court is a constitutional instrumentality of government. Under the established policy of the State from its earliest days that body has been clothed with certain powers which are essentially the sovereign powers of the State as contradistinguished from matters of county affairs. We have in mind especially such powers as the following:

Dividing the county into election precincts;

Ordering local option elections in regulation of liquor;

Canvassing returns of elections of State
officers;

Appointing a health officer to act under
direction of the State Health Officer;

Acting as Board of Equalization in fixing
values of land for purposes of State taxation;

Approving reports and official bonds of
county officers.

Such a power to exercise "all powers of the
county" by the five-member agency set up in the proposed
charter, certainly is not expressly conferred by the
amendment; neither is is impliedly conferred by the lan-
guage of subsection (3)a. providing:  "In any event, in
addition to the powers and duties provided by any such
charter, such governing body shall exercise all powers,
and discharge all duties which, in the absence of the
provisions hereof, would devolve by law on County Com-
missioners and County Commissioners' Courts."  The sig-
nificant phrase in the absence of the provisions hereof,
forbids such implication.  By the term "the provisions
hereof," is meant all the provisions of the amendment
including the many and mandatory restrictions. prohibi-
tions, limitations and qualifications.  The language
immediately following is highly important and bespeaks
plainly the limited extent and scope of the powers con-
templated.  It is as follows:  "Further, any such char-
ter may provide for the organization, re-organization,
establishment and administration of the government of
the county, including the control and regulation of the
performance of and the compensation for all duties re-
quired in the conduct of the county affairs, subject to
the limitations herein provided."

We note the following among the many express
limitations:

". . . May adopt a county home rule charter,
to embrace those powers appropriate hereto,
within the specific limitations hereinafter
provided. . .   It is expressly forbidden that
any such charter may inconsonantly affect
the operation of the general laws of the
State relating to the judicial, tax, fiscal,

educational, police, highway and health system,
or any other department of the State's super-
ior government.  Nothing herein contained
shall be deemed to authorize the adoption of
a charter provision inimical to or inconsistent
with the sovereignty and established public
policies of this State, and no provision having
such vice shall have validity as against the
State. . . ."  Art. IX, Sec. 3(2).

". . . Other than as herein provided, no such
charter shall provide for altering the juris-
diction or procedure of any court. . . ."ibid
subsection (3)b.

"Such charter may authorize the governing
body . . . to prescribe the schedule of fees
to be charged by the officers of the county
. . . provided, however, no fee for a speci-
fied service shall exceed in amount the fee
fixed by General Law for that same service. . .
may prescribe the qualifications for services,
provided the standards therefor be not lower
than those fixed by the General Laws of the
State." ibid subsection (5)

". . . No such transfer or yielding of func-
tions (of State agencies) may be effected, un-
less the proposal is submitted to a vote of
the people, and, unless otherwise provided by
a two-thirds vote of the total membership of
each House of the Legislature, . . . particu-
larly, it is provided that the power to create
funded indebtedness and to levy taxes in sup-
port thereof may be exercised only by such
procedures, and within such limits, as now are,
or hereafter may be, provided by law to con-
trol such appropriate other governmental agen-
cies were they to be independently administer-
ed. . . ."  ibid subsection (6)a.

A reading of the amendment will show that it
contains more prohibitions, limitations, qualifications,
exceptions and restrictions than it does grants of power.
Indeed, Section (1) declaring the purpose of the Act to
be a grant of the "highest degree of local self-govern-
ment which is consistent with the efficient conduct of

those affairs by necessity lodged in the Nation and the State," is in truth the sole affirmative grant of power, and be it remembered this grant is limited to "local self-government."  On the whole the amendment is more concerned with the preservation of the over-all supremacy of the State in matters concerning State affairs. Under every test it will appear that an effort to abolish the Commissioners' Court would be in disregard of these numerous prohibitions and limitations and therefore "inimical to, and inconsistent with the sovereignty and established public policies of this State."  The amendment should not be construed as a complete divorcement of county and state in the matter of governmental powers.  The Commissioners' Court of the county has not been expressly abolished by the amendment in any event, and such abolishment will not be implied.  Repeals by implication are not favored.  Any other construction would bring chaos in the administration of the law.

This discussion does not exhaust the large problems raised by Article IX, Section 3, its supporting Statutes , and the proposed charter.  To discuss each line and phrase would make this opinion too long.  Problem and fact situations will arise which cannot be anticipated or properly decided in advance.  If called upon to pass thereon, they will be treated separately as they arise.

## SUMMARY

H. B. No. 70 of the 50th Legislature is a valid Act and authorizes Delta County to adopt a County Home Rule Charter.  Morgan v. Potter, 298 N. W. 763.

The Manager provided in such a Charter may not be authorized to appoint and remove subordinate officers as such would be an unlawful delegation of power by the governing body.  The Charter may not abolish the office of County Tax Assessor and Collector, District Clerk, Sheriff, Justice of the Peace, Constable, or the Commissioners' Court, since each of these is a State functionary and exercises powers

and is charged with duties of state-wide importance as contradistinguished from county affairs, and such abolishment would be contrary to the express prohibitions of the amendment.

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By W. T. Williams
Assistant

Ocie Speer
Assistant

WTW
OS:wb

APPROVED:

Price Daniel
ATTORNEY GENERAL